CITY OF CHATTANOOGA, Plaintiff in Error, v. MABEL EVATT, by Next Friend, and C. M. EVATT, Defendants in Error (Two Cases).

Eastern Section. March 19, 1932.

Petition for Certiorari denied by Supreme Court, June 4, 1932.

J. W. Anderson, of Chattanooga, for plaintiff in error.
Estill & Morgan, of Chattanooga, for defendants in error.

DeWITT, J. Mabel Evatt, by her father as next friend, sued the City of Chattanooga for damages for personal injuries sustained from the alleged negligence of the city in allowing a precipice, or pitfall, to remain unbarricaded where an alleged public street terminated at the right of way of the Cincinnati, New Orleans, and Texas Pacific Railway. On the night of July 6, 1929, she was seriously injured when the automobile in which she was riding as a guest was driven over the embankment and upon the railway track and cross-ties. Her father also sued the city to recover for loss of her services, medical and hospital, expenses, etc. These actions have been tried twice and together. Upon the first trial, verdicts were directed for the city in both cases. Upon appeal in error the judgments of dismissal were reversed and the causes were remanded. Upon the second trial verdicts for $6500 in favor of Mabel Evatt and $1000 in favor of C. M. Evatt were approved by the circuit judge and judgments against the city were accordingly rendered. The city has appealed in error, the motions for a new trial having been overruled.

In certain assignments of error it is insisted that because the notice served upon the city described different injuries from those received by the young lady, it was error to admit testimony of herself and Dr. W. A. Banks as to injuries not described in the notice; and that through this error the jury rendered verdicts which were excessive and so excessive as to evince passion, prejudice and caprice. The specific difference claimed is that injuries to the pelvis, the right hip and the head were not included in the general description in the notice, as follows:

"An injury and fracture of my right thigh, three deep internal bruises on my back in the region of the kidneys, a laceration between my shoulders and two lacerations on my left leg, one on my left hip and my vertebrae was fractured and I was otherwise seriously and internally injured, my body was bruised, lacerated and wounded."

The question thus made as to the sufficiency of this notice to cover all the injuries described in the testimony was made and passed upon by this court upon the former appeal. It was held in the opinion by Judge Thompson that there was not a sufficient variance between the injuries as described in the notice and as proved at the trial, to justify the trial court in directing a verdict

in favor of the defendant. The evidence upon the second trial contained no intimation that the notice which was prepared by the plaintiffs' attorneys, was not honestly given with reference to the description of the injuries.

Chapter 55 of the Public Acts of 1913 provides that the written notice required therein to be given to the mayor of the municipality must state the time and place where the injury was received, and the general nature of injury inflicted. The failure to give the notice is a valid defense against any and all liability of the city which might otherwise exist on account of the defective or negligent condition of a street, alley, sidewalk or highway. The statute is strictly construed against such liability. Hilson v. Memphis, 142 Tenn., 620, 221 S. W., 851; Thompson v. Chattanooga, 143 Tenn., 477, 226 S. W., 184; Knoxville v. Felding, 153 Tenn., 586, 285 S. W., 47; Gilkey v. Memphis, 159 Tenn., 220, 17 S. W. (2d) 4; Sneed v. Memphis, 6 Tenn. Apps., 1.

The testimony of Mabel Evatt objected to was as follows:

"Q. What did it do to your head? A. That is all it did to my left hip, my right hip, I don't know whether it was fractured, or dislocated, or something.

"Q. It was injured so you could not walk? A. I did not even realize I had a right arm or leg.

"Q. Go and answer? A. My right hip was hurt, I don't know whether fractured or dislocated but it was hurt very severely. At the time it felt that my right limb and both feet were deadened or my right side and my limb, I had three punctures in the back of my head, a laceration in my right limb and one on my shoulder."

The testimony of Dr. W. A. Banks objected to was as follows:

"We found she was suffering from shock and a fractured pelvis and numerous bruises over her body.

"Q. Was there anything the matter with her hip? A. The hip and pelvis work together; she was hurt there; the sacro-illiac joint that connects in the back was also separated.

"Q. Now the pelvis bone; what effect did that injury have on her then, thereafter and forever? A. A fracture of the pelvis bone is very painful there is so much soft tissue that is injured. We got a fairly good apposition. The last examination I made, she had a good deal of callous formation which makes an enlargement there and that narrows down the birth tract and the tract where the rectum passes through.

"Q. What effect would that have on her bearing children, that injury? A. In some cases it causes prolonged labor with more pain, and in some cases with pronounced amount of cal-

lous you have to do cesarean, removing through the abdominal wall. It causes prolonged labor.

"Q. Was this injury to the pelvis bone a temporary or permanent injury? A. She has a permanent injury."

The law of this case was set forth as aforesaid in the opinion by Judge Thompson and will be here adhered to. We may say however, that we have no disposition to differ from the conclusion thus reached, for the contention relates particularly to a supposed difference between the thigh or hip, and the pelvis and the sacro-illiac joint; and while the word "hip" may not technically include all of the pelvis, it does include the lateral parts of the pelvis and the upper part of the femur or upper bone of the leg, together with the fleshy parts covering them. See Webster's International Dictionary for definitions of these terms. We think therefore that these injuries described in the testimony objected to were fairly covered by the description of the injuries contained in the notice. Assignments of error numbers 6, 7, 8, 10 and 11 are overruled.

It is insisted that there is no evidence to support the verdicts and that the court erred in failing to sustain the motions of defendant for peremptory instructions in its favor. Also that the undisputed evidence shows that the plaintiff's injuries were the result of the negligent operation of the automobile in which she was a passenger, by one Paul Weathers, that said automobile was being operated in violation of the ordinance of the City of Chattanooga; that she was guilty of contributory negligence as a matter of law, the driver and the other two occupants of the automobile having testified that it was being driven in excess of the speed limit fixed by the ordinance of the City of Chattanooga, and she testified that she did not know the rate of speed at which said automobile was being driven.

As all of these propositions must be tested from the same viewpoint, they will be treated and disposed of together. Mabel Evatt was about nineteen years of age. She lived with her parents east of Missionary Ridge a few miles east of Chattanooga. She was employed at Grants, a merchantile house on Market Street. The accident occurred late on a Saturday night. The duties of Miss Evatt at the store detained her on Saturday nights until about nine o'clock. In the afternoon of that day she was approached by Paul Weathers and Miss Louise Morgan (whom he afterward married), and introduced to a young man named Sam Cureton, and invited to ride with Miss Morgan and the others on that evening. She was already acquainted with Mr. Weathers and Miss Morgan. Weathers and Cureton rented a Ford roadster having a rumble seat and about seven o'clock in the evening they went for Miss Morgan and according to appointment went to Grant's Store for Miss Evatt, and about nine o'clock they began driving. It was their original in-

tcntion to attend a show, but on account of the heat and the lateness of the hour they decided to spend the evening driving. After driving around the city for a time they went across the Tennessee River to a place called Signal Garden where they had some sandwiches and cold drinks and later on returned to the City and did some more driving, and later on went to the "Nu-way" at the corner of Eleventh and Market Streets, opposite the Hotel Patten, where they had more refreshments. They then started out Tenth Street in the direction of Missionary Ridge to take Miss Evatt home. They drove straight on until they came to the precipice and drove over it—being hurled down on the railroad ties and track.

Market Street extends north and south. Tenth and Eleventh Streets extended eastwardly (parallel to each other). From Market Street Tenth Street is one block north of Eleventh Street. At points a mile or two east of Market Street both Tenth and Eleventh Streets are intersected at right angles by Central Avenue, which extends north and south, then Tenth Street extends further on east from Central Avenue 487 feet to the railroad right of way, which extends north and south. Said railroad right of way is wide enough to contain twelve or thirteen parallel tracks and is in a hollow. East of the right of way is the National Cemetery and also a city park. On account of this there are only two streets extending eastward to Missionary Ridge. One of these streets is McCallie Avenue, which is parallel with and a few blocks north of Tenth Street, and which crosses the said right of way on a viaduct. The other is Main Street, which is parallel and is a few blocks south of Tenth Street but which does not cross the right of way because said right of way turns westward and goes under Central Avenue a block or two north of Main Street. There is no street east of Central Avenue and west of said right of way which extends from Tenth Street north to McCallie Avenue, or from Tenth Street south to Main Street. In view of the foregoing it is apparent that when Weathers (in driving east on Tenth Street for the purpose of taking Miss Evatt to her home) reached Central Avenue, he should have either turned north and gone to McCallie Avenue or south and gone to Main Street.

Weathers and Miss Morgan were riding on the front seat and Cureton and Miss Evatt on the rumble seat, from which they could not see the road in front of them. The four people in the car had only a general knowledge of the section in which the accident happened. They knew, or at any rate, Miss Evatt knew that they should go through to McCallie Avenue or to Main Street in order to go on East to Missionary Ridge, but none of them knew that there was no other street east of Central Avenue upon which they could go north to McCallie Avenue. As they approached, or as they were crossing,

Central Avenue plaintiff told the driver Weathers to turn on to it, but he had already gone too far across said avenue to make the turn. He slowed up, but rather than back up and turn he remarked that he would go on to the next street and turn north to McCallie Avenue. With that intention he then proceeded east on Tenth Street and ran off the bluff or bank. From Central Avenue eastward Tenth Street has an oiled surface for about 315 feet. From that point further on it was paved with gravel or chert. On the extreme south side of Tenth Street the distance from the right of way line where Tenth Street reaches it to the bluff, is twenty-eight feet. In the center of Tenth Street the distance from the right line where the south side of Tenth Street reaches the right of way to the bluff, is 49.4 feet. On the south side of Tenth Street—particularly on the extreme south side—the right of way is paved or covered with gravel or chert so as to have the appearance of the surface of a street for about half the distance between the end of the street at the right of way line and the bluff said cleared portion of bluff being a part of the little roadway turning south on the right of way. The gravel road extended from the end of the oiled street to the point where this road turned southward. From this portion of the road to where the car ran off the bank there was short grass and there is evidence that at night it had the appearance of a paved street. This distance was from fourteen to eighteen feet according to the testimony of witnesses.

There was sharp conflict in the testimony as to the speed at which the car was running; and also whether or not the occupants of the car had been drinking or were drunk. There was testimony that the car was being driven at the rate of about twenty miles an hour. There was much testimony indicating that these persons, including the plaintiff, had been drinking intoxicating liquors. This was very positively denied by all of them. They denied that they were drinking or under the influence of liquor, or that they were traveling at a high rate of speed at the time of the accident. We must take the view that the jury accepted this testimony and we are bound by this finding of the jury. It is insisted that Miss Evatt is barred from recovery by the negligence of the driver in exceeding the speed limit of fifteen miles an hour, prescribed by an ordinance of the City of Chattanooga then in force, and that even if the city was negligent in failing to provide barriers at the end of Tenth Street, she is not entitled to recover. The plaintiff did not testify as to the rate of speed at which the automobile was going. She was not aware of the existence of an unbarricaded precipice at the end of Tenth Street. She could not see the street in front of the car as it was going along. Any negligence of the driver in exceeding the speed limit was therefore not imputable to her. She was merely a

guest in the car. The situation was not like that of a guest in an automobile consciously approaching a railroad crossing,, or other place, where the danger was obvious. It is true that if an adult, while riding in a car driven by another, sees, or ought by due diligence to see, that the driver is not taking proper precautions, it is the duty of the guest to remonstrate or give some warning of danger, and a failure to do so is negligence. R. R. v. Anderson, 159 Tenn., 55, 15 S. W. (2d), 753. But from the evidence the jury could reasonably conclude that by due diligence the plaintiff would not have observed that the speed limit was being exceeded, or that there was danger ahead, until the danger became obvious. She had a right to assume that the driver, if apparently exercising reasonable care, would continue to do so. Railway v. White, 158 Tenn., 407, 15 S. W. (2d), 1.

The City contends that the accident occurred on private property neither adjacent to a street or so near to it as to make the street unsafe for persons using it while in the exercise of ordinary care; and that the city was under no obligation to put up barriers to prevent travelers from leaving the traveled portion of the highway and running into danger on adjoining property where the street itself is safe. The principle of law thus invoked is well-settled, and the question is whether or not it is applicable to the facts of this case.

It is contended that Tenth Street terminates at the railroad right of way; that the automobile traveled forty-eight feet beyond this point of termination, and approximately twenty-three feet from where the road turns southward from the street; that it went at least twenty-three feet over private property which had not been used or traveled as a street.

The circuit judge, in his instructions to the jury, said:

"Now, gentlemen, if this was a public street, and the evidence seems to be undisputed that it was, it was the duty of the defendant to maintain it in a reasonably safe condition for the use of the traveling public."

It is hornbook law that this is the duty of a city as to maintenance of its streets.

By an ordinance of March 13, 1928, the Board of Commissioners of the City of Chattanooga ordained that Tenth Street be extended eastward over this railroad right of way. By another ordinance passed on the same day the railway companies were required to build a viaduct across their tracks along this extension of Tenth Street. The city filed a bill seeking a mandatory injunction requiring these companies to build the viaduct in compliance with the said ordinance. It is insisted that a street cannot be acquired by a city by merely passing an ordinance and declaring it to be a street.

There can hardly be a more definite dedication than by a municipal ordinance, and the provisions of such an ordinance in themselves constitute an acceptance of the street. A direct ordinance is the usual and proper form for establishing a street although it may be effected indirectly by ordinance or resolution recognizing the dedication or existence of the street. 44 C. J., 884 and cases cited. In Doyle v. Chattanooga, 128 Tenn., 433, 161 S. W., 997, decisions of a court of Civil Appeals of Texas (Gibbs v. Ashford, 27 Tex. Civil Appeals, 629, 66 S. W., 858; Dallas v. Gibbs, 27 Tex. Civ. Apps., 275, 65 S. W., 81) were cited with apparent approval to the effect that the execution of an official map by the city showing the street offered to be dedicated to be such, was an evidence of an acceptance. We are of the opinion that there was no error in the instructions complained of. Furthermore, we think that the case was properly submitted to the jury under the rule of Niblett v. Nashville, 12 Heisk., 684, 27 Am. R., 755, "that if an obstruction or excavation be permitted which renders the alley, street or highway unsafe or dangerous to persons or vehicles, whether it lie immediately in or on an alley, street or highway, or so near it as to produce the danger to the passes at any time when he shall properly desire to use such highway, it is such a nuisance as renders the corporation liable."

Upon this subject we quote from the opinion of Judge Thompson already referred to:

"We attach no particular importance to the fact that on the north side of Tenth Street the bluff is a few feet west of the end of the street, and therefore actually within the street. This, for the reason that the accident did not happen there, and because the north side near the bluff had never been improved, had a ditch or ditches in it and was covered by high grass and weeds. But on the south side the street improved as it was, after approaching the bluff at what might be regarded as right angles, ended at a distance varying from only twenty-eight to 49.4 feet from said bluff. And a portion (about half on the extreme south) of this varying distance between the end of the street and the bluff was cleared of grass, had gravel or chert on it and had the appearance of the ordinary used surface of a street.

"The plaintiff's evidence was to the effect that both the end of the street and the bluff were unlighted, unguarded and unbarricaded and that none of the occupants of the car could or did see said bluff. Since the last or east thirty feet or so sloped gradually upward to the edge of the bluff, a driver approaching it would not be alarmed at not seeing the surface of any further street in front of him because he would natural-

ly suppose that the street began sloping downward again and out of the rays of his lights. Plaintiff's proof further showed that said bluff was from twelve to fifteen feet high, and that the car fell onto the railroad tracks below.

"Since the travel eastward along Tenth Street was necessarily headed directly at the bluff, it seems to us that under the situation hereinbefore outlined the jury would, if the case had been submitted to it under proper instructions, and if it had believed the evidence in behalf of the plaintiffs as to the manner in which Weathers was driving the car, etc., have been justified in finding that the city had been guilty of negligence which was the proximate cause of the accident. This, for the reason that the city had in effect aimed a street at a dangerous and unobservable excavation and had ended said street within a few feet of it without any barriers or obstructions which a person driving along said street could see. And, of course, the fact that the bluff was on the railroad companies' right of way was immaterial."

The remaining assignment of error relates to some remarks said to have been made by counsel for the plaintiffs during the trial during the examination of the witness Cureton. The witness had been asked a question as to the existence of weeds on this extension of the street. Counsel made some remark but the record does not contain the remark, but merely states that he made some remarks which the reporter did not understand. Objection was made, the court told counsel not to make those remarks, that the facts must be determined from proof and it was improper to put into the record remarks of that sort. Counsel then said that he would withdraw his remarks. Of course, in the absence of any evidence as to the nature of the remarks, it is impossible for this court to determine whether or not the remarks materially affected the verdict of the jury, even though they were withdrawn by counsel.

All of the assignments of error are overruled and the judgments of the circuit court are affirmed. Judgment will be entered in this court for the plaintiffs against the City of Chattanooga for the amounts awarded them in the circuit court, with interest from date of judgment in said court, and all costs of this cause. The costs of the appeal will be adjudged also against the surety on the appeal bond.

Faw, P. J., and Crownover, J., concur.